UNITED STATES of America, Appellee,

v.

Novia TURKETTE, Jr.,
Defendant–Appellant.

UNITED STATES of America, Appellee,

v.

John VARGAS, Defendant–Appellant.

Nos. 79–1545, 79–1546.

United States Court of Appeals,
First Circuit.

Argued June 6, 1980.

Decided Sept. 23, 1980.

Before COFFIN, Chief Judge, BOWNES, Circuit Judge and BOYLE,* District Judge.

BOWNES, Circuit Judge.

This appeal raises, for the first time in this circuit, the issue of whether Title IX of the Organized Crime Control Act of 1970, Pub.L. 91–452, 84 Stat. 941, 18 U.S.C. §§ 1961–68 (1970), authorizes the prosecution of individuals for engaging together in a series of criminal acts unrelated in any way to any legitimate business organization. RICO, an acronym for "Racketeer Influenced and Corrupt Organizations," was designed to break the stranglehold of racketeers on legitimate businesses and unions. We must determine whether the government's use of RICO in this case exceeded its statutory scope and purpose.

In Count Nine of a nine–count indictment, defendants–appellants Novia Turkette, Jr.,[1] John Vargas, and eleven others[2] were charged with conspiring to "conduct, and participate directly and indirectly, in the conduct of the affairs of [an] enterprise, which would engage in, and the activities of which would affect interstate commerce, through a pattern of racketeering activity." The indictment alleged that the defendants were associated with each other and with an enterprise whose purpose was illegal trafficking in drugs, committing arson and insurance fraud, influencing the outcome of state trials, and bribing police officers. These crimes, as well as participation in the conduct of the enterprise through acts of racketeering, were alleged as acts in furtherance of the conspiracy.[3] Count One charged Turkette and nine co–defendants

Alfred Paul Farese, Everett, Mass., for appellant, Novia Turkette, Jr.

John Wall and Harry C. Mezer, Boston, Mass., with whom Cullen & Wall, Boston, Mass., was on brief, for appellant, John Vargas.

William C. Bryson, Atty., Dept. of Justice, Boston, Mass., with whom Edward F. Harrington, U. S. Atty., Martin D. Boudreau, Sp. Atty., Boston, Mass., and Joel M. Gershowitz, Atty., Dept. of Justice, were on brief, for appellee.

* Of the District of Rhode Island, sitting by designation.

1. Appellant Turkette's father, Novia Turkette, Sr., was charged and tried with his son. Reflecting an effort to maintain the necessary distinction between the two defendants, the district court record throughout refers to this appellant as "Turkette, Jr." Because Novia Turkette, Sr. is not involved in the instant appeal, we refer to Turkette, Jr. as "Turkette."

2. The other defendants named in the indictment are: Edward Young, Michael Kamens, Novia Turkette, Sr., Gabriel DeMarco, Thomas Brown, Walter Woodyatt, Robert Jadis, Lynn Rice, Donald Canzano, Phillip A. Fraher, Jr., and Richard Ferguson.

3. Count Nine of the indictment concludes with the following language: "All in violation of Title 18, United States Code, Sections 1961, 1962(d), and 1963." We note that 18 U.S.C. § 1961 is a definitional section containing no proscriptive language. Section 1963 imposes criminal penalties for violation of section 1962. No acts are made criminal by section 1963.

with distribution and possession with intent to distribute controlled substances. Counts Two through Five charged arson–for–profit schemes devised by Turkette and Vargas. Counts Six and Seven charged Turkette and codefendant Fraher with arson of an automobile and insurance fraud. Count Eight charged a similar scheme involving Turkette and codefendant Brown.[4]

Convicted by a jury on all nine counts, Turkette was sentenced to serve consecutive terms of twenty years on the substantive counts. A twenty–year concurrent term and a $20,000 fine were imposed on Count Nine, the RICO conspiracy count. On appeal, he alleges that his motion for acquittal on the RICO count was improperly denied; that the trial court erred in denying his motions for relief from prejudicial joinder and severance; and that it erred in allowing Vargas to admit into evidence, over Turkette's objection, certain photographs seized from his home by the government.

Vargas repeatedly moved for acquittal on the RICO count and for severance, claiming lack of evidence linking him to the RICO conspiracy as the basis of misjoinder. At the close of the government's case, the RICO conspiracy charge against him was dropped. His motions for severance, however, were denied. The jury found him guilty of one count of mail fraud. He was acquitted of participation in the second mail fraud scheme. Vargas' main contention to this court is that the legal theory upon which the government predicated its RICO indictment was incorrect.

The validity of Count Nine of the indictment depends upon the interpretation of two provisions of RICO. Count Nine, section 1–O, alleges that "[d]efendants were associated with an 'enterprise' as defined in Title 18, United States Code, Section 1961(4) . . . ." Count Nine, section 2, charges defendants with conspiring to violate Title 18, United States Code, Section 1962(c). 18 U.S.C. § 1961(4) defines "enterprise":

"enterprise" includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity[.]

18 U.S.C. § 1962(c) makes it unlawful

for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

The government's position is that the broad definition of enterprise in 1961(4) brings within the proscription of 1962(c) any individual or group of individuals who engage in a pattern of racketeering activity. Since the evidence here showed such a pattern[5] by the defendants, the statute, it is argued, therefore, applies to them.

Defendants' argument goes beyond the words of these two sections of RICO. Their position is that the Act was intended to protect legitimate business enterprises from being preyed upon and taken over by racketeers. RICO does not apply, they argue, to individuals whose only enterprise activity is completely criminal. Although it would be easy to dismiss out–of–hand an argument that asks us to exempt criminal activity from prosecution, we must examine the statute and its legislative history.

We first look at the other substantive sections of 18 U.S.C. § 1962. Section 1962(a)[6] provides that no person may use

---

4. Seven defendants entered guilty pleas prior to trial. Trial commenced with six defendants. Before the close of the evidence, mistrials were granted as to two of the codefendants who subsequently entered pleas of guilty to one count.

5. There is no doubt that defendants' activities came within the definition of a "pattern of racketeering activity" in 18 U.S.C. §§ 1961(1) and (5).

6. 18 U.S.C. § 1962(a) provides:

(a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated

racketeering income to acquire any interest in any enterprise engaged in or which affects interstate commerce, and imposes a strict limitation on the use of such income to purchase securities on the open market. Acquisition of any enterprise through a pattern of racketeering activity is prohibited by 1962(b).[7] These two subsections make sense only if the protected "enterprise" is legitimate. If section 1962(c) is interpreted as the government urges, then it is at odds with (a) and (b).[8]

A careful reading of sections 1961(4) and 1962(c) convinces us that they cannot be used as tandem springboards to reach any individual or groups of individuals who engage in a pattern of exclusively criminal racketeering activity. Each specific enterprise enumerated in section 1961(4) is a legitimate one. Under the principle of *ejusdem generis*, the final catch–all phrase "any ... group of individuals associated in fact ..." should also be limited to legitimate enterprises. If the Congress had intended to include "criminal enterprises" in the definition section, it would have done so. Contrary to the plain meaning of section 1961(4), the government uses the word "any" to engraft into the section a phrase that is not there: "enterprise includes" wholly criminal activity.

If we give section 1962(c) the construction urged by the government, it becomes internally redundant and important phrases are rendered superfluous. If "a pattern of racketeering" can itself be an "enterprise"

for purposes of section 1962(c), then the two phrases "employed by or associated with any enterprise" and "the conduct of such enterprise's affairs through [a pattern of racketeering activity]" add nothing to the meaning of the section. The words of the statute are coherent and logical only if they are read as applying to legitimate enterprises.

This is confirmed by the fact that RICO, in addition to establishing substantive crimes for underworld attacks on legitimate businesses, provides civil remedies designed to rehabilitate victimized enterprises and protect them from further depredations. The remedies available include divestiture, dissolution, reorganization and restrictions on future activities and investments by the racketeer. 18 U.S.C. § 1964(a). Treble damages are also available to "[a]ny person injured in his business or property by reason of a violation of section 1962 ...." 18 U.S.C. § 1964(c).

Viewed in its entirety, RICO is a combination of criminal sanctions and civil remedies designed to protect legitimate commercial enterprises from the onslaught of racketeers and provide a means of repairing the effects of such incursions.

Our interpretation of "enterprise" to mean only a legitimate enterprise is reinforced by the legislative history of RICO. More than a decade ago, Congress decided that organized crime posed such a grave threat to society that only new, more strin-

---

as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce. A purchase of securities on the open market for purposes of investment, and without the intention of controlling or participating in the control of the issuer, or of assisting another to do so, shall not be unlawful under this subsection if the securities of the issuer held by the purchaser, the members of his immediate family, and his or their accomplices in any pattern or racketeering activity of the collection of an unlawful debt after such purchase do not amount in the aggregate to one

percent of the outstanding securities of any one class, and do not confer, either in law or in fact, the power to elect one or more directors of the issuer.

7. 18 U.S.C. § 1962(b) provides:

   (b) It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

8. The final substantive RICO crime makes it "unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section." 18 U.S.C. § 1962(d).

gent legislation could ameliorate the situation. The problem was multifaceted. Large–scale gambling, narcotics traffic, and loansharking were found to be the primary sources of organized crime's illicit revenues;[9] extortion, murder, and arson, *inter alia*, were its modus operandi. Congress pinpointed problems of proof–particularly weaknesses in evidence–gathering methods and the reluctance, predicated on fear, of witnesses to testify against organized criminals–as the major reason why most organized crime participants went unpunished.[10] Financial and physical incursions by racketeers into legitimate businesses and unions had become "one of the Nation's most serious criminal justice and economic problems."[11] After almost two years of debate, drafting, and revision, it enacted the eleven titles of the Organized Crime Control Act of 1970[12] which contained a wide range of procedures designed to enhance the gathering and admissibility of evidence. These include provisions for special grand juries authorized to report on organized crime and law enforcement corruption;[13] a witness immunity program;[14] recalcitrant witness provisions;[15] and increased penalties for certain habitual offenders.[16] The Act created a new federal offense designed to "strike at organized crime's principal source of revenue: illegal gambling."[17] Participation by five or more persons in a gambling business with $2,000 in daily revenues for more than thirty days became a federal crime.[18] RICO (Title IX) is an integrated whole within this comprehensive legislation.

The purpose of RICO was the "elimination of the infiltration of organized crime and racketeering into legitimate organizations operating in interstate commerce."[19] It was found that there were three methods used by organized criminals to attain ownership, control, and operation of legitimate businesses, associations, and unions. (1) After establishing a financial base with monies obtained from gambling, narcotics trade, and myriad other criminal acts, the racketeer invests that money in legitimate enterprises. (2) Racketeering methods are used by one acting outside the enterprise to gain control of it. This includes the use of extortion to acquire a partnership or stockholder interest in a concern, "insurance" protection, and illicit stock ownership, sale, and manipulation. (3) Legitimate businesses are corrupted by employees, associates of trade groups, or union members who use racketeering practices to acquire control or conduct the legitimate business through illegitimate means.

The Senate Judiciary Committee cited encroachments upon such diverse fields of endeavor as jukebox and vending machine distribution, laundry services, food wholesaling, banking, insurance, entertainment industries, and stock exchanges, among others, as illustrative of the scope of the problem.[20] Senator McClellan, one of the sponsors, detailed the means by which organized

---

9. *Organized Crime Control: Hearings on S.30 and related proposals.* Before *Subcomm. No. 5 of the House Comm. on the Judiciary*, 91st Cong., 2d Sess. 96 (1970) (statement of Senator John L. McClellan) [hereinafter cited as *House Hearings on S.30*].

10. Senate *Comm. on the Judiciary, Report on Organized Control Act of 1969, S.Rep.No. 617, 91st Cong., 1st Sess. (1969)* [hereinafter cited as *S.Rep.No. 91 617*].

11. *House Hearings on S.30, supra*, at 96 (statement of Senator John McClellan).

12. Pub. L. 91 452, 84 Stat. 922 (1970). The Organized Crime Control Act of 1969, S.30, was introduced on January 15, 1969. The bill passed the House on September 23, 1970.

13. 18 U.S.C. § 3333.

14. *Id.* 18 U.S.C. § 6001.

15. *Id.* 18 U.S.C. § 6003.

16. *Id.* §§ 3575 78.

17. *S.Rep.No.* 91 617, *supra*, at 71.

18. 18 U.S.C. § 1955.

19. *S.Rep.No.* 91 617, *supra*, at 76.

20. *Statement in Justification: S.Rep.No.* 91 617, *supra*, at 76–77. *See also: House Hearings on S.30, supra*, at 106: "Involvement of La Cosa Nostra leaders in legitimate businesses has become the rule rather than the exception." (statement of Senator John L. McClellan).

criminals gain control of businesses and unions. His remarks illuminate the nature of criminal activity that RICO was intended to curb.

The corrupt and violent methods by which organized crime members conduct their gambling and loansharking operations are adapted as means of acquiring and operating businesses. Threats, arson and assault are used to force competitors out of business and obtain larger shares of the market. Building contractors pay tribute for the privilege of using non–union labor, while labor unions infiltrated by organized crime raise no objection. A corporation is bled of its assets, goods obtained by the corporation on credit are sold for a quick profit, and then the corporation is forced into bankruptcy while the criminals who infiltrated it disappear. Large sums in stocks and bonds are stolen from brokerage houses and banks, and then used as collateral to obtain loans. Income routinely is understated for tax purposes, so that mob businesses have competitive advantages over businesses which report all their income. These methods and others give such a competitive advantage to the mob enterprise that monopoly power is approached or gained, and prices are raised.[21]

Against this backdrop, Congress enacted the tripartite prohibitions of 18 U.S.C. §§ 1962(a), (b), and (c), fashioned "to block the infiltration of racketeers into *legitimate* operations . . . ."[22] (emphasis added).

The following summary of RICO issued by the Justice Department aptly describes the legislative intent; the second paragraph states the purpose of 1962(c).

Title IX is designed to inhibit the infiltration of *legitimate business* by organized crime, and, like the previous title [illegal gambling], to reach the criminal syndicates' major sources of revenue. In addition to creating offenses punishable by the traditional criminal sanctions of fine and imprisonment, the proposed statute would also authorize civil remedies modeled upon those found in the antitrust laws.

.      .      .      .      .

*The conduct of the affairs of a business, by a person acting in a managerial capacity*, through racketeering activity is also proscribed.

.      .      .      .      .

The proposal appears to cover most of the methods through which La Cosa Nostra customarily infiltrates and operates legitimate business enterprises.[23]

(emphasis added).

What emerges from RICO's legislative history is that Congress believed it was enacting a new federal crime, that of interference with legitimate enterprises by racketeers and racketeering methods.[24] There is nothing suggesting that it was also legislating against criminal enterprises. The House floor debates on the Organized Crime Control Act is devoid of anything indicating that any member of Congress thought RICO would reach anything but legitimate businesses. Representative Poff, the floor manager for the bill, stated:

[P]erhaps the single most alarming aspect of the organized crime problem in the United States in recent years has been the growing infestation of racketeers *into legitimate business enterprises* . . . . Title IX of S.30 provides the machinery whereby the infiltration of racketeers *into legitimate businesses* can be stopped and the process reversed when such infiltration does occur.

116 Cong.Rec. 35,295 (1970). (emphasis added).

In its statement of purpose, the Senate report is unequivocal: "[Title IX] has as its purpose the elimination of the infiltration of organized crime and racketeering into

---

**21.** *House Hearings on S.30, supra*, at 106 (statement of Senator John L. McClellan).

**22.** *H.R.Rep.No.* 1549, 91st Cong., 2d Sess. 57 (1970).

**23.** *House Hearings on S.30, supra*, at 170 (Department of Justice comments on S.30).

**24.** *Id.* at 662–63 (testimony of Assistant Attorney General Will Wilson).

legitimate organizations operating in interstate commerce." *Senate Comm. On The Judiciary, Report On Organized Crime Control Act of 1969*, S.Rep.No. 617, 91st Cong., 1st Sess. 76 (1969). A section discussing organized crime's penetration of legitimate business follows the statement of purpose.

The focus on legitimate enterprises was emphasized when the House of Representatives rejected a proposed amendment adding a fourth substantive prohibition to section 1962–membership in a Mafia or La Cosa Nostra organization. The amendment defined the groups as "nationally organized criminal groups composed of persons of Italian ancestry *forming an underworld government ruled by a form of board of directors, who direct or conduct a pattern of racketeering activity and control the national operation of a monopolistic trade restraining criminal conspiracy.*"[25] (emphasis added). Similar legislation introduced several years earlier was also rejected. At that time, the attorney general advised against enactment because, *inter alia*,

A principal purpose of S.2187 as I understand it is to deprive the leaders of the Mafia and of similar syndicates of the service of the underlings through whom they operate. That objective can I hope be achieved through the continued use of such statutes as 18 U.S.C. 371, which makes it unlawful to conspire to violate any law, and 18 U.S.C. 1952 which outlaws interstate travel in aid of racketeering enterprises.[26]

A comparison if RICO's legislative history with that of 18 U.S.C. § 1955, outlawing illegal gambling businesses, shows that Congress knew how to draft legislation which would make the operation of an illegitimate enterprise a federal offense.

A more effective effort must be mounted to eliminate illegal gambling. In that effort the Federal Government must be able not [only] to deny the use and facilities of interstate commerce to the day–to–day operations of illegal gamblers–as it can do under existing statutes–*but also to prohibit directly substantial business enterprises of gambling* ....[27]

(*emphasis added*). The absence of any corresponding language in RICO's legislative history is not happenstance. Defining RICO to include wholly illegal enterprises would obviate or render redundant a significant part of the illegal gambling statute, passed at the same time as RICO, both parts of the Organized Crime Control Act of 1970. 18 U.S.C. § 1955 extends federal criminal jurisdiction to illegal gambling businesses. The definition of illegal gambling is very specific. It means a gambling business which

(i) is a violation of the law of a State or political subdivision in which it is conducted;

(ii) involves five or more persons who conduct, finance, manage, supervise, direct or own all or part of such business; and

(iii) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day.

18 U.S.C. § 1955(b). If RICO can be applied to any series of criminal acts, as the government urges, it would encompass, *inter alia*, the commission within a ten–year period of any two acts of gambling affecting interstate commerce, thus allowing the complete circumvention of the gambling statute's tightly drawn limitations.

It must also be pointed out that the Drug Abuse, Prevention and Control Act, passed on October 27, 1970, twelve days after RICO, contains a specific section, 21 U.S.C. § 848, aimed at continuing criminal enterprises involving traffic in narcotics. The Congress carefully defined what it means to be engaged in a continuing criminal enter-

---

**25.** 116 *Cong.Rec.* 35343 (1970) (amendment of Representative Biaggi).

**26.** 116 *Cong.Rec.* 35344 (1970) (remarks of Attorney General Nicholas Katzenbach).

**27.** *S.Rep.No.* 91-617, *supra*, at 73.

prise.[28]  Here, also, the government's definition of RICO allows it to swallow the continuing criminal enterprise section of the Drug Abuse, Prevention and Control Act.

Congress wanted to eliminate organized crime.  But RICO was only one arm of a broadbased attack.  It was intended to accomplish the distinct purpose of "dislodg[ing] the forces of organized crime from legitimate fields of endeavor."[29]  It was not intended to be used against the wholly criminal enterprise.

This analysis comports with that of RICO's sponsor, Senator McClellan.  "Title IX is aimed at removing organized crime from our legitimate organizations." McClellan, *The Organized Crime Control Act*, 46 Notre Dame Law. 55, 141 (1970).

This background casts grave doubts on the government's simplistic and literal interpretation of 18 U.S.C. § 1961(1) and 1962(c).  Under the government's interpre-

tation, the concept of "enterprise" is entirely eliminated from this section of the statute.  If we follow the government's rationale, one or more individuals can be prosecuted under 1962(c) for engaging in a "pattern of racketeering activity" which affects interstate commerce.  "Pattern of racketeering activity" is defined as

> at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity[.]

18 U.S.C. § 1961(5).  Racketeering activity covers a multitude of state and federal crimes.  18 U.S.C. § 1961(1).[30]  This means, if we accept the government's logic, that one individual who commits two of the crimes defined in 1961(1) within a ten–year period can be prosecuted for violating RICO as well as for the substantive crimes them-

---

**28.**  21 U.S.C. § 848(b) provides:
  (b) For purposes of subsection (a) of this section, a person is engaged in a continuing criminal enterprise if–
  (1) he violates any provision of this subchapter or subchapter II of this chapter the punishment for which is a felony, and
  (2) such violation is a part of a continuing series of violations of this subchapter or subchapter II of this chapter–
  (A) which are undertaken by such person in concert with five or more other persons with respect to whom such person occupies a position of organizer, a supervisory position, or any other position of management, and
  (B) from which such person obtains substantial income or resources.

**29.**  *S.Rep.No.* 91-617, *Supra*, at 79.

**30.**  18 U.S.C. § 1961(1) provides:
  any act or threat involving murder, kidnaping, gambling, arson, robbery, bribery, extortion, or dealing in narcotic or other dangerous drugs, which is chargeable under State law and punishable by imprisonment for more than one year;  (B) any act which is indictable under any of the following provisions of title 18, United States Code: Section 201 (relating to bribery), section 224 (relating to sports bribery), sections 471, 472, and 473 (relating to counterfeiting), section 659 (relating to theft from interstate shipment) if the act indictable under section 659 is felonious, section 664 (relating to embezzlement from pension and welfare funds), sections 891–894

(relating to extortionate credit transactions), section 1084 (relating to the transmission of gambling information), section 1341 (relating to mail fraud), section 1343 (relating to wire fraud), section 1503 (relating to obstruction of justice), section 1510 (relating to obstruction of criminal investigations), section 1511 (relating to the obstruction of State or local law enforcement), section 1951 (relating to interference with commerce, robbery or extortion), section 1952 (relating to racketeering), section 1953 (relating to interstate transportation of wagering paraphernalia), section 1954 (relating to unlawful welfare fund payments), section 1955 (relating to the prohibition of illegal gambling businesses), sections 2314 and 2315 (relating to interstate transportation of stolen property), sections 2341 2346 (relating to trafficking in contraband cigarettes), sections 2421–24 (relating to white slave traffic), (C) any act which is indictable under title 29, United States Code, section 186 (dealing with restrictions on payments and loans to labor organizations) or section 501(c) (relating to embezzlement from union funds), or (D) any offense involving fraud connected with a case under title 11, fraud in the sale of securities, or the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in narcotic or other dangerous drugs, punishable under any law of the United States;  ... [.]

selves. Although it is an extreme example, there could be a RICO prosecution against a prostitute for two acts of solicitation within the ten–year period, if she travels interstate in plying her trade. The individual, by commission of the predicate substantive crimes, becomes an "enterprise."

We are also troubled by the fact that, under the government's proposed use of RICO, federal jurisdiction is extended to practically every criminal activity affecting interstate commerce. Since the crimes encompassed by "racketeering activity" specifically cover state crimes, the federal government has a powerful tool for injecting itself into the area of state law enforcement. The government's reading of RICO renders it essentially equivalent to a traditional state conspiracy statute so long as the interstate commerce and two acts within ten–year provisions are satisfied. This gives the federal government a powerful tool for usurping a significant province of state criminal jurisdiction. While the government's use of RICO may be an effective way of fighting organized crime, it should not be undertaken without, at least, some evidence that the Congress recognized RICO's potential for use in this way when it passed the Act. There is no indication in the legislative history that the Congress realized that RICO might result in such a deep incursion into the field of state and local law enforcement.

We realize that our interpretation as to the scope of RICO is contrary to current case law in those other circuits that have considered this issue. In the Fourth and Fifth Circuits, unanimous panels have declared unequivocally that RICO's umbrella covers purely criminal enterprises. *United States v. Whitehead*, 618 F.2d 523 (4th Cir. 1980) (prostitution ring); *United States v. Diecidue*, 603 F.2d 535 (5th Cir. 1979), *cert. denied*, 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 781 (1980) (enterprise's scope in-

cluded robbery, counterfeiting, illegal use of explosive, and murder); (Godbold, J. dissenting, would reverse because RICO conspiracy indictment insufficient); *United States v. Elliott*, 571 F.2d 880 (5th Cir.), *cert. denied*, 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978) (multiple forms of racketeering); *United States v. Malatesta*, 583 F.2d 748 (5th Cir. 1978), *modified in banc on other grounds*, 590 F.2d 1379, *cert. denied*, 440 U.S. 962, 99 S.Ct. 1508, 59 L.Ed.2d 777 (1979) (narcotics ring); *United States v. Morris*, 532 F.2d 436 (5th Cir. 1976) (gambling operation). *But see United States v. McLaurin*, 557 F.2d 1064 (5th Cir. 1977), *cert. denied*, 434 U.S. 1020, 98 S.Ct. 743, 54 L.Ed.2d 767 (1978) (panel holding a prostitution ring constituted an enterprise indicated that it was compelled to follow the circuit's *per se* rule absent a "clearer and fuller directive from the Court" or an *in banc* opinion reversing its earlier position). While the Second, Seventh and Ninth Circuits have espoused the view that an association of criminals is prohibited under section 1962(c), each has done so with one judge vigorously dissenting. *United States v. Aleman*, 609 F.2d 298 (7th Cir. 1979) (Swygert, J., dissenting), *cert. denied*, 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 780 (1980) (home robbery); *United States v. Rone*, 598 F.2d 564 (9th Cir. 1979) (Ely, J., dissenting), *cert. denied*, 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 780 (1980) (murderers and extortionists); *United States v. Altese*, 542 F.2d 104 (2d Cir. 1976) (Van Graafiland, J., dissenting), *cert. denied*, 429 U.S. 1039, 97 S.Ct. 736, 50 L.Ed.2d 750 (1977) (gambling). The Sixth Circuit had adopted the "legitimate enterprise" view with one judge dissenting in *United States v. Sutton*, 605 F.2d 260 (6th Cir. 1979) (Engel, J., dissenting) (*opinion withdrawn and petition for rehearing in banc granted* ) (1980). The *in banc* opinion in *Sutton* has not yet been released.[31]

---

**31.** The District of Columbia Circuit quoted the broad language employed by several other circuits in *United States v. Swiderski*, 593 F.2d 1246 (D.C. Cir. 1978), *cert. denied*, 441 U.S. 933, 99 S.Ct. 2056, 60 L.Ed.2d 662 (1979). Factually, *Swiderski* differs from the case at bar

because there, a legitimate business, a restaurant, was owned and run by racketeers who used it to shield a cocaine smuggling operation. The restaurant was the enterprise.

The government informs us that *United States v. Manchester*, 605 F.2d 1198 (3d Cir.

Although the Supreme Court has not yet addressed the issue directly, it has indicated that our construction of the statute is not aberrational. Interpreting the gambling provisions of the Organized Crime Control Act of 1970, the Supreme Court noted that Title IX (RICO) "seeks to prevent the infiltration of legitimate business operations affecting interstate commerce by individuals who have obtained investment capital from a pattern of racketeering activity." *Iannelli v. United States*, 420 U.S. 770, 787 n.19, 95 S.Ct. 1284, 1294, 43 L.Ed.2d 616 (1975).

Our examination of the roots of the current case law finds them shallow and infirm. One of the tap root cases is *United States v. Cappetto*, 502 F.2d 1351 (7th Cir. 1974), *cert. denied*, 420 U.S. 925, 95 S.Ct. 1121, 43 L.Ed.2d 395 (1975). *Cappetto* involved a civil injunction action under section 1964 to restrain the operation of an illegal gambling business. Stating that Congress intended a broad application of "enterprise," the Seventh Circuit could find nothing in sections 1962(b) or (c) which would remove an illegitimate enterprise from the statute's scope. *Id.* at 1358. The Fifth Circuit cited the broad language of *Cappetto* when it construed an illegal gambling business as an enterprise for purposes of section 1962(c) in *United States v. Hawes*, 529 F.2d 472 (5th Cir. 1976). *Hawes*, however, involved several legitimate enterprises which distributed legal and illegal coin–operated electric machines to legitimate bars and social clubs. The operation of the businesses was within the ambit of RICO. Because the defendants argued that their legitimate enterprises were illegitimate, it is unclear on what theory of enterprise the case turned. Nevertheless, *Hawes* provided the cornerstone for the line of Fifth Circuit cases which hold that a criminal enterprise is proscribed by RICO. *See* cases cited *supra*.

■ The prevailing case law starts with the premise that a combination of criminals

associated to further acts of racketeering constitutes an enterprise and that such enterprise falls within the ambit of sections 1961(4) which defines enterprise as "any ... association in fact" and 1962(c) to which the 1961(4) definition applies. The statute's use of "any," plus the failure of RICO to distinguish between legitimate and illegitimate enterprises, according to the cases, precludes exclusion of illegitimate associations from the concept of enterprise. *United States v. Rone*, 598 F.2d at 568; *United States v. Altese*, 542 F.2d at 106. We think this dragnet use of the word "any" obscures the critical issue: the proper scope of "enterprise" in the context of the statute as a whole and its legislative history. To support their construction, most of the cases point to a clause in Title IX which provides that its provisions should "be liberally construed to effectuate its remedial purposes." But this was directed at the "full panoply of civil remedies" that Title IX "brings to bear on the infiltration of organized crime into legitimate business or other organization." [32] To this extent, Title IX "is remedial rather than penal." [33] The civil remedies, not the criminal sanctions, should be liberally construed. To hold otherwise violates the principle that "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." *Rewis v. United States*, 401 U.S. 808, 812, 91 S.Ct. 1056, 1059, 28 L.Ed.2d 493 (1971); *United States v. Campos–Serrano*, 404 U.S. 293, 92 S.Ct. 471, 30 L.Ed.2d 457 (1971). Nevertheless, the courts have liberally construed "enterprise" lest they create a "loophole for illegitimate business to escape" RICO's coverage. *United States v. Altese*, 542 F.2d at 106–07.

We think that the courts' natural antipathy to organized crime has clouded their perception of RICO, its purpose, and legislative history. What seems to be overlooked is that persons who participate in an illegitimate enterprise will not escape punishment

---

1979) (table), *cert. denied*, 445 U.S. 945, 100 S.Ct. 1344, 63 L.Ed.2d 780 (1980), is a table affirmance of a conviction under RICO for engaging in a wholly unlawful enterprise.

32. *S.Rep.No.* 91 617, *supra*, at 81.

33. *Id.* at 82.

for their criminal activities if they are properly indicted and tried for these acts. Each act of racketeering delineated in section 1961(1), as well as conspiracy to commit such crimes, are already criminal acts under federal or state statutes, or both. We need not distort a statute in order to properly prosecute criminals. RICO was not enacted as an offensive weapon against criminals, but as a shield to thwart their depredations against legitimate business enterprises.

■ *For the foregoing reasons, we hold that the RICO indictment in this case was invalid.*

We now consider the effect of this ruling on the defendants. Turkette and Vargas maintain that they were improperly joined in the indictment and, hence, improperly joined for trial because the crimes with which they were charged did not form a "series of acts or transactions" in accordance with the precepts of Fed.R.Crim.P. 8(b).[34] It is claimed that the evidentiary spillover from one crime to another, and from defendant to defendant, was inherently prejudicial. Vargas also claims that the trial judge erred in refusing to sever his case from Turkette's because Vargas' participation in mail fraud was unrelated to Turkette's participation in drugstore burglaries. Because most of the testimony at trial pertained to Turkette's activities, Vargas argues that the evidence which was introduced to prove the series of narcotics

violations was highly prejudicial to him. Vargas points to the dismissal, at the close of the government's case, of the RICO conspiracy count against him as signifying improper joinder and erroneous refusal to sever.

■ Guilt is both individual and personal. *Kotteakos v. United States*, 328 U.S. 750, 773, 66 S.Ct. 1239, 1252, 90 L.Ed. 1557 (1946). Thus, a defendant charged with committing multiple crimes is entitled to a separate trial for each crime that is not "substantially part of the same transaction," *McElroy v. United States*, 164 U.S. 76, 17 S.Ct. 31, 41 L.Ed. 355 (1896); one accused with others, has "the right not to be tried *en masse* for the conglomeration of distinct and separate offenses committed by others[.]" *Kotteakos, supra*, 328 U.S. at 775, 66 S.Ct. at 1253. Nevertheless, joinder of offenses or parties has the salutory effect of promoting judicial economy. Fed.R. Crim.P. 8 balances the competing considerations of the benefit to the court, prosecution, and the public with the presumptive prejudice inherent in the consolidation of parties or offenses by permitting joinder if certain requirements are met. Rule 8 "set the limits of tolerance" beyond which the danger of prejudice outweighs the benefit, and any joinder which does not fall within Rule 8 "is per se impermissible."[35] *King v. United States*, 355 F.2d 700, 703 (1st Cir. 1966). Rule 8(a)[36] governs the joinder in

---

**34.** Fed.R.Crim.P. 8(b) provides:

(b) Joinder of Defendants. Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.

**35.** Although a line of cases has developed which stands for the proposition that Rule 8 misjoinder can be harmless, *see, e. g., United States v. Martin*, 567 F.2d 849 (9th Cir. 1977); *Baker v. United States*, 401 F.2d 958 (D.C. Cir.), *cert. denied*, 393 U.S. 836, 89 S.Ct. 110, 21 L.Ed.2d 106 (1968); *United States v. Granello*, 365 F.2d 990 (2d Cir. 1966), *cert. denied*, 386 U.S. 1019, 87 S.Ct. 1367, 18 L.Ed.2d 458 (1967), the traditional view set forth originally in *McElroy v. United States*, 164 U.S. 76, 17 S.Ct. 31, 41 L.Ed. 355 (1896), that misjoinder is prejudi-

cial *per se* has its adherents. *See, e. g., United States v. Nettles*, 570 F.2d 547 (5th Cir. 1978); *United States v. Whitehead*, 539 F.2d 1023 (4th Cir. 1976); *Metheany v. United States*, 365 F.2d 90 (9th Cir. 1966); *Cupo v. United States*, 359 F.2d 990 (D.C. Cir. 1966), *cert. denied*, 385 U.S. 1013, 87 S.Ct. 723, 17 L.Ed.2d 549 (1967); *King v. United States*, 355 F.2d 700 (1st Cir. 1966).

**36.** Fed.R.Crim.P. 8(a) provides:

(a) Joinder of Offenses. Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.

an indictment of multiple offenses charged against a single defendant. The gravamen of joinder under Rule 8(a) is similarity or interrelatedness of offenses. Although, on its face, Rule 8(a) is not confined to single–defendant indictments, most courts have taken the position that it is so limited and, where more than one defendant is involved, Rule 8(b) alone provides the appropriate standards for joinder. *United States v. Roselli*, 432 F.2d 879, 898 (9th Cir. 1970), *cert. denied*, 401 U.S. 924, 91 S.Ct. 883, 27 L.Ed.2d 828 (1971); *Cupo v. United States*, 359 F.2d 990, 992 (D.C. Cir. 1966), *cert. denied*, 385 U.S. 1013, 87 S.Ct. 723, 17 L.Ed.2d 549 (1967); *King, supra*, 355 F.2d at 704; 1 *C. Wright, Federal Practice and Procedure* § 144 (1969 & Supp.1978).

■ Because the instant case commenced with a multiparty indictment, joinder, if proper, must be predicated upon Rule 8(b). The provisions of 8(b), which focus on identity of parties and relatedness of offenses, provide:

Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.

Viewed in its entirety, the instant indictment shows some identity of defendants because Turkette is named in all nine counts. Two separate genres of criminal activity, drug–related offenses and arson–mail fraud, comprise the eight substantive counts. Count Nine, the RICO conspiracy charge, alleged that the substantive offenses were perpetrated as part of an overall scheme to conduct a criminal enterprise through these and other criminal acts. "A conspiracy count can be a sufficient connecting link between codefendants and separate substantive offenses to permit their joinder in a single indictment[.]" *United States v. Luna*, 585 F.2d 1, 4 (1st Cir.), *cert. denied*, 439 U.S. 852, 99 S.Ct. 852, 58 L.Ed.2d 157 (1978). Here, however, we have found the conspiracy count to be invalid.

Where, however, the defendant can show that the charge of a joinder of defendants in conspiratorial action is based on a legal interpretation that is improper, the court cannot base its 8(b) ruling on the written words alone but must determine if, under correct legal theory, joint action was actually involved.

*United States v. Levine*, 546 F.2d 658, 663 (5th Cir. 1977). We must, therefore, determine whether, absent the RICO conspiracy count, the joinder was proper under Rule 8(b). This depends upon whether the defendants participated in the same series of acts.

■ Rule 8(b) does not explicate the meaning of "series." In *King*, we said that it is something more than mere "similar acts." 355 F.2d at 703. Cases construing 8(b) indicate that some relatedness between offenses is necessary for there to be a series of acts or transactions. *See, e. g., United States v. Weisman*, 624 F.2d 1118 (2d Cir. 1980) (continuing crimes committed in theatre operation commenced with fraudulent sales of stock in 1973 and ended with bankruptcy fraud five years later; bankruptcy fraud participant properly joined with those who had previously committed acts of racketeering in operation of theatre because acts charged constituted a series of acts or transactions); *Williams v. United States*, 416 F.2d 1064 (8th Cir. 1969) (kidnapping in furtherance of attempt to avoid apprehension for first kidnapping was part of a series of interrelated crimes); *United States v. Baker*, 393 F.2d 604 (9th Cir.), *cert. denied*, 393 U.S. 836, 89 S.Ct. 110, 21 L.Ed.2d 106 (1968) (receiving, concealing, and converting stolen goods parts of a series); *Scheve v. United States*, 184 F.2d 695 (D.C. Cir. 1950) (assault committed in course of running an illegal gaming table and illegal gambling same series of acts).

*See also United States v. Ritch,* 583 F.2d 1179 (1st Cir.), *cert. denied,* 439 U.S. 970, 99 S.Ct. 463, 58 L.Ed.2d 430 (1978) (under Rule 8(a), bail jumping from drug charges and drug charges themselves joinable because one stemmed from the other).

Relatedness of offenses can be established by demonstrating that essentially the same facts must be shown for each of the consolidated crimes. As Judge Aldrich wrote in *King,*

> However, Rule 8(b) is not limited to situations in which proof of the other criminal transaction would be admissible in a separate trial. It goes beyond, to others, the excuse being the benefit to the court. But to offset the prejudice where multiple defendants are being joined even though they did not engage in a joint act, such as conspiracy, *Kitchell v. United States,* 1 Cir., 1965, 354 F.2d 715, this possibility of benefit should explicitly appear from the indictment or from other representations by the government before trial. Classic examples of such a benefit are when there is an overlapping of issues, as, for example, when some defendants are charged with transporting stolen goods in interstate commerce, and others are charged with receiving the goods, so stolen and transported. *Kitchell v. United States, supra; Caringella v. United States,* 7 Cir., 1935, 78 F.2d 563, or when defendants are charged with conspiracy to conceal a crime that part of their number are charged with committing, *United States v. Perlstein,* 3 Cir., 1941, 120 F.2d 276 (rev'g on other gr'ds), 2nd convictions aff'd, 1942, 126 F.2d 789, cert. den. 316 U.S. 678, 62 S.Ct. 1106, 86 L.Ed. 1752. Where, however, there are no presumptive benefits from joint proof of facts relevant to all the acts or transactions, there is no "series," Rule 8(b) comes to an end, and joinder is impermissible. *United States v. Spector,* 7 Cir., 1963, 326 F.2d 345, 350; *McElroy v. United States,* 1896, 164 U.S. 76, 81, 17 S.Ct. 31, 41 L.Ed. 355.

355 F.2d at 704. (footnote omitted.) If the factual matrices of the alleged facts are different, there is no series and, hence, no joinder. *See, e. g., United States v. Gentile,* 495 F.2d 626 (5th Cir. 1974) (proof for sale of PCP entirely different from that for LSD transaction); *United States v. Marionneaux,* 514 F.2d 1244 (5th Cir. 1975) (two separate conspiracies to obstruct justice, albeit involving the same case, not a series because each conspiracy had different participants).

We, therefore, must examine the evidence to determine whether the facts necessary to show a series of drug related transactions were also required to prove the series of arson–mail frauds.

### Narcotics Offenses

From March, 1977, to April, 1978, Novia Turkette, Kenneth Landers, and Edward Young, an original defendant, jointly robbed eighteen pharmacies in Boston or its environs, employing the same modus operandi for each robbery. After arrival at a targeted store in Young's station wagon, Turkette would disengage the burglar alarm system and return to Young's car to listen for word on a police scanner that the alarm had short–circuited. Once they felt assured that the alarm had not alerted the police, Young and Landers would force an entry into the drugstore. They would then fill duffel bags with those drugs designated by Young as having a high "street" resale value, and, on occasion, with money and non–pharmaceutical merchandise. Turkette would continue to monitor the scanner and survey the immediate area for police activity, often calling the intruders from a telephone booth to check on their progress or inform them if policemen were in the area. After sequestering the drugs and burglar tools in a deep well in Young's station wagon, the trio would sort and inventory the drugs, generally at Young's house, and determine each person's share of the heist. The drugs were then distributed to pushers for cash or on consignment. According to Landers, defendant Kamens, the owner of the Modern Alarm Company, accompanied Turkette and Young on several

occasions to pharmacies whose alarms were maintained by Modern. Kamens disconnected the alarms so that they would not ring into the police stations. In addition, Kamens agreed to ignore alarms of certain drug stores when they rang in his office so that Turkette, Landers, and Young could break into the stores without fear of discovery.

### Arson–Mail Fraud

The proof relative to Count Two, the one on which Vargas was found guilty, was as follows. Vargas and George Papamichael owned two adjacent new, but unsold, modular homes in Groveland, Massachusetts. In June, 1977, Landers arrived at Turkette's house where he observed Turkette talking outside with Vargas. Turkette told Landers that Vargas was interested in having some property burned and Landers agreed to drive with Vargas to the property at a later date. Shortly thereafter, Landers and Vargas drove to the Groveland property. Vargas instructed Landers to burn only the house on the right. Turkette gave Landers $50 to purchase incinerants and Landers set fire to the house that night, destroying it completely. Vargas paid Landers $1,000 which Landers split with Turkette. Vargas collected $22,000 from his insurer. The United States Mails were used in processing the insurance claim.

Landers testified that, in September, 1977, Vargas asked him to destroy a house in Middleton, Massachusetts. Vargas showed the property to Landers and gave him the house and burglar alarm keys. He instructed Landers to burn the house in October when the residents, Mr. and Mrs. Santos, would be on vacation. Landers hired Gordon Wren, not named in the indictment, to incinerate the house. The two drove to the location. Wren set the fire which activated smoke detectors, and Landers fled. According to Landers, Vargas later paid him $1,000 out of which he paid Wren $250. Turkette's share was $300.

Charles Werner, a Peabody policeman posing as a corrupted officer, recorded conversations with Turkette which detailed the Middleton fire. The jury could infer from these tapes that Turkette was hired by the husband of defendant Santos to destroy the Middleton property.

In December, 1977, Turkette acquired an MGB automobile from his cousin, one Schiazza. The car was to be registered and insured by Phil Fraher, one of the original defendants. Title could not be obtained, however, until an outstanding mortgage of $1,000 was repaid. Turkette gave Fraher ten bottles of liquid Dilaudid to sell in order to obtain the money necessary to repay the loan. The testimony is unclear whether Fraher actually completed this transaction. Turkette kept the vehicle for several months, but had to have it repaired frequently. He decided to destroy it. Fraher was directed to pretend he had driven the car to work and report it stolen at the end of his shift. In the meantime, Turkette, Landers, and one Cliffie Teague pushed the car into a parking lot where Teague burned it. Fraher filed an insurance claim through the mail.

Thomas Brown, one of the original defendants, owed Turkette $3,500. He also owned an uninsured late–model Buick which a friend of his had damaged in an accident. Turkette arranged to have the car disappear after Mildred Parrish, Brown's sister, insured the auto. Parrish, through use of the mails, executed an insurance claim on behalf of Brown. The money was used to repay the debt Brown owed Turkette.

### Conclusion

■ Our review of the transcript shows that the narcotics violations evidence was unnecessary to prove the arson–mail fraud and vice versa. There was, thus, no presumptive benefit to the government in the consolidation of the two different sets of criminal activity. Accordingly, "there is no 'series,' Rule 8(b) comes to an end, and joinder is impermissible." *King, supra,* 355 F.2d at 704.

This case points up another infirmity in the government's interpretation of RICO: it avoids the strictures of Rule 8(b). By

**910**

inserting the RICO conspiracy charge, the government consolidated in one indictment acts and transactions which otherwise could not have been joined.

Our ruling as to RICO makes it unnecessary to discuss the other issues raised by defendants.

*The Judgments are reversed and the cases remanded for new trials.*