BOWNES, Circuit Judge.
 

 Charles Tashjian and James Campbell appeal their convictions on one count of receiving stolen property in violation of 18 U.S.C. § 2315 and one count of fraudulently transferring property in contemplation of bankruptcy in violation of 18 U.S.C. § 152. Campbell also appeals his conviction on one count of mail fraud in violation of 18 U.S.C. § 1341 and one count of using a fictitious name in furtherance of mail fraud, contrary to 18 U.S.C. § 1342.
 
 [1]
 
 As the principal grounds for reversal, the appellants assert, (a) that various counts of the indictment were impermissibly and prejudicially joined for a single trial and (b) that numerous incidents during the proceedings below, some the result of prosecutorial misconduct, so tainted the proceedings as to deny them a fair trial. In addition, Campbell challenges his convictions on a variety of other grounds.
 

 Tashjian and Campbell were among fifteen defendants
 
 [2]
 
 named in a twenty-four count indictment.
 
 [3]
 
 The core of the indictment, Count One, charged all of the defendants and five unindicted individuals conspired over a five-year period to operate a bust out bankruptcy fraud enterprise in violation of Title IX of the Organized Crime Control Act, known as the Racketeer Influenced and Corrupt Organization Act (RICO), 18 U.S.C. § 1962.
 
 [4]
 
 The remaining counts charged different subgroups of the defendants with the actual commission of mail frauds, extortion, bankruptcy frauds, and the transportation and receipt of stolen goods. These alleged offenses were characterized by the Government as specific instances of the “pattern of racketeering activity,”
 
 see
 
 18 U.S.C. § 1961(1), (5), and § 1962(c), through which the bust out enterprise would pursue its objective. Although the jury acquitted both Tashjian and Campbell on Count One, we first briefly describe the central events of the alleged, though unproven, conspiracy as the context for the appellants’ challenge to their convictions on other counts.
 

 As portrayed by the Government, the conspiracy began in May, 1974, when Tash-jian and Campbell met with Kenneth Weiner,
 
 [5]
 
 who was then operating Abington Discount of Abington, Massachusetts, as a bust
 
 *832
 
 out, obtaining merchandise on credit with no intention of paying for it and selling it at below “cost” prices.
 
 [6]
 
 Tashjian proposed to Weiner that in exchange for a guaranteed fifty percent of the invoice price,
 
 [7]
 
 Weiner sell his goods exclusively to him. After checking with business associates about Tashjian, Weiner readily accepted. For the next three months, Weiner sold most, though not all, of his bust out to Tashjian at the agreed price. During this same period, Weiner introduced Tashjian to the operators of other bust out stores, including defendants Thomas DeChane, Ronald Davies and Allan Klein. Tashjian purchased bust out goods from these operators and supplied most of them at different times with false credit references to facilitate their fraudulent orders from various manufacturers. Sales to Tashjian by the bust out operators, including Weiner, were subject to a ten percent protection fee exacted by another defendant, Richard De-Vincent, who often delivered Tashjian’s payments to the operators. DeVincent’s allegedly extortionate transactions with Weiner and Allan Klein were the source of two counts in the indictment not directly at issue in this appeal.
 

 In August of 1974 Tashjian learned through his subordinate, Michael DellOrfa-no, that Weiner desired to sell Abington Discount. Tashjian offered to buy the store, Weiner agreed, and from then until December, 1974, when Abington filed in bankruptcy, Tashjian and Campbell, assisted by DellOrfano and defendant Frederick Benjamin, operated the store as a bust out. At the time he bought Abington, Tashjian arranged with DellOrfano to have DellOrfa-no’s parents serve as straw owners of the corporate stock.
 

 After busting out Abington Discount, Tashjian, assisted by Campbell, devoted most of his commercial efforts to the operation of Gerry’s Bargain Center, located in Whitman, Massachusetts. Throughout 1975 and 1976, Tashjian purchased merchandise from various bust out operators. His sources for bust out goods included Allan’s Tape and Stereo, owned by Allan Klein; Warren’s Gift Co. and Warren’s Enterprises, operated by defendants Ronald Davies and Thomas DeChane; Gallant Discount, operated by defendant Joseph Ricci (who also had some connection with Warren’s Enterprises); Cinema Sport and Music Co., operated primarily by Ricci with some aid from Davies; Village Discount, operated by Ann and Barry Silver (with assistance from their partners Davies and Ricci); and Bapi Services Co., operated by Campbell and defendant Gerald Dyer. Campbell joined Dyer at Bapi Services in 1976 after leaving Gerry’s Bargain Center because of an unexplained disagreement with Tashjian. As in his dealings with Weiner, Tashjian appar
 
 *833
 
 ently paid these bust out operators a maximum of fifty percent of the operator’s invoice price. In order to assure exploitable credit terms with their suppliers, the operators obtained false credit references both from Tashjian and from each other. Tash-jian and the bust out operators also shared their knowledge as to which suppliers were particularly easy marks for obtaining merchandise on credit.
 

 Except for several deals between Tashji-an and Village Discount early in 1977, we are left in the dark about the activities of the alleged conspiracy during that year. In 1978 Tashjian secured a new source of bust out goods when approached in August by defendant Walter Downing, who was operating Vangel Marketing, Inc., as a bust out. Because of Tashjian’s fear that he was the subject of a criminal investigation, which proved to be well-founded, he arranged for Downing to sell his goods to Pete’s Discount, which was operated by defendants Larry Martin and Mitchell Weissman. Although Downing actually sold his bust out goods to Martin and Weissman, not Tashji-an, it was Tashjian he turned to for relief when Martin and Weissman fell substantially behind in their payments. For reasons not important to this appeal, several months after his initial conversation with Tashjian, Downing decided to cooperate with the FBI in its investigation of bust out bankruptcy frauds. In February, 1979, a grand jury returned the indictment that initiated this case.
 

 Severance
 

 Both Tashjian and Campbell unsuccessfully moved before trial to sever their cases from those of the other defendants and renewed these motions several times during the trial. On appeal, they contend that the initial joinder exceeded the limits imposed by Federal Rule of Criminal Procedure 8(b). Campbell also argues that the district court abused its discretion in refusing to grant a severance pursuant to Federal Rule of Criminal Procedure 14.
 

 The appellants charted their course on this issue in light of our decision in
 
 United States v. Turkette,
 
 632 F.2d 896 (1st Cir. 1980), in which we held that Title IX of the Organized Crime Control Act, known as the Racketeer Influenced and Corrupt Organization Act (RICO), 18 U.S.C. §§ 1961-1968, applies only to “legitimate” enterprises.
 
 See
 
 18 U.S.C. §§ 1961(4)
 
 [8]
 
 and 1962. According to the appellants, many of the counts that comprised the indictment could not have been joined under Rule 8(b)
 
 [9]
 
 if it were not for Count One, which, because the enterprise it alleged was wholly illegitimate, must be adjudged invalid in light of
 
 Turkette.
 
 Since oral argument of this appeal, however, the Supreme Court has completely undercut the appellants’ position. In
 
 United States v. Turkette,
 
 - U.S. -, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981), the Court concluded that the proscriptions of RICO reach all enterprises, both legitimate and illegitimate, and thus reversed our decision.
 

 With the problem of RICO’s scope resolved adversely to the appellants, we see no reason to question the validity of the joinder under Rule 8(b). Count One embraced all of the acts and transactions upon which the other twenty-one counts were based, thus providing the link necessary for joinder of those counts.
 
 See United States v. Weisman,
 
 624 F.2d 1118, 1129 (2d Cir. 1980),
 
 cert, denied,
 
 449 U.S. 871, 101 S.Ct. 209, 66 L.Ed.2d 91 (1980),
 
 United States v. Luna,
 
 585 F.2d 1, 4 (1st Cir.),
 
 cert, denied,
 
 439 U.S. 852, 99 S.Ct. 160, 58 L.Ed.2d 157 (1978);
 
 United States v. Adams,
 
 581 F.2d
 
 *834
 
 193, 197 (9th Cir.,
 
 cert. denied,
 
 439 U.S. 1006, 99 S.Ct. 621, 58 L.Ed.2d 683 (1978). Neither the appellants’ brief nor our review of the record reveals any evidence that the Government acted in bad faith in bringing Count One. The breadth of the alleged conspiracy does not in itself evidence an impermissible prosecutorial objective, but rather simply reflects the fact that RICO enables the Government to cast a wider net than was possible under traditional conspiracy principles.
 
 See United States v. Elliott,
 
 571 F.2d 880, 902-03 (5th Cir.),
 
 cert. denied,
 
 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978). Nor does the jury’s acquittal of Tashjian and Campbell on Count One undermine the district court’s implicit conclusion that there was a sufficient factual basis to Count One to permit joinder of the twenty-two counts.
 
 See Schaffer v. United States,
 
 362 U.S. 511,516, 80 S.Ct. 945, 948, 4 L.Ed.2d 921 (1960);
 
 United States v. Luna,
 
 585 F.2d at 4.
 

 Even though the propriety of the initial joinder has been sustained, a defendant may still secure a severance pursuant to Rule 14
 
 [10]
 
 if he can show that he would suffer substantial prejudice from a joint trial.
 
 See United States v. Patterson,
 
 644 F.2d 890, 900 (1st Cir. 1981);
 
 United States v. Thomann,
 
 609 F.2d 560, 564 (1st Cir. 1979);
 
 United States v. Luna,
 
 585 F.2d at 4. Whether a severance should be granted is a question for the trial court’s discretion and thus denial of a severance will be overturned on appeal only if that discretion has been abused.
 
 See United States v. Thomann,
 
 609 F.2d at 564;
 
 United States v. Luna,
 
 585 F.2d at 4-5. Our review of the record convinces us that the district court did not abuse its discretion in denying Campbell’s motions to sever.
 

 Campbell argues that the Government introduced a considerable array of evidence at trial of no relevance to the four counts on which he was convicted, creating a danger that the jury convicted him for reasons unrelated to his innocence or guilt of the offenses charged in those counts. But it appears to us that Campbell suffered at most no more prejudice “than that which necessarily inheres whenever multiple defendants or multiple charges are jointly tried.”
 
 United States v. Adams,
 
 581 F.2d at 198;
 
 see King v. United States,
 
 355 F.2d 700, 703 (1st Cir. 1966). From the outset of the trial the district court carefully strove to minimize this risk of prejudice, limiting the admissibility of evidence when appropriate and finally instructing the jurors in clear terms to judge each individual individually and solely on the evidence admitted against that defendant. See
 
 United States v. Richman,
 
 600 F.2d 286, 299 (1st Cir. 1979);
 
 Gorin
 
 v.
 
 United States,
 
 313 F.2d 641, 646 (1st Cir. 1963). The jury’s acquittal of Campbell on the conspiracy charge, Count One, attests to its fidelity to the court’s instructions.
 
 See United States v. Rich-man,
 
 600 F.2d at 299;
 
 United States v. Luna,
 
 585 F.2d at 5;
 
 United States v. Graham,
 
 548 F.2d 1302,1311 n.7 (8th Cir. 1977). We find no abuse of discretion in the denial of the motions to sever.
 
 [11]
 

 Right to a Fair Trial
 

 Tashjian and Campbell contend that this case was tried to a “tatoo of prejudice” that
 
 *835
 
 so infected the proceedings as to deny them a fair trial. Hardly a day passed during the thirty-three days of trial, they argue, without something occurring to exacerbate the taint created initially by prosecutorial misconduct during the selection of the jury. Accepting the responsibility for many of these events, the Government concedes that they should not have happened but maintains that the appellants’ rights to a fair trial were not abridged. Of the numerous incidents referred to by the appellants, we think three merit discussion.
 

 A. The first potentially prejudicial incident arose during the voir dire of a prospective juror, Henry Yenovkian, who was the secretary-treasurer of a Teamsters local that represented the drivers employed by a Boston taxicab company. At the Government’s request, the court asked Yenovkian whether he knew of any criminal investigations concerning the Teamsters. He responded that he was aware of the Central States Pension Fund investigation and added that his local did not participate in that fund. Apparently satisfied with this answer, the court accepted Mr. Yenovkian as a juror, to which the Government did not object. As the appellants emphasize, by this point in the jury selection the Government had exhausted its peremptory challenges.
 

 After the jury selection had been completed, John Trela, an FBI agent assisting the prosecution, recalled that in 1978 Ye-novkian had been one of the subjects of an FBI investigation of Yenovkian’s local. On the instruction of a Government attorney, Trela set out to discover whether Yenovki-an knew of the earlier investigation. Trela interviewed Bruce Wallace and Andrew Keyho, both of whom were employed by the cab company, had cooperated in the 1978 investigation, and were well acquainted with Henry Yenovkian. As a result of these inquiries, the Government concluded that Yenovkian did know of the earlier investigation and moved that he be removed from the jury for cause. When defense counsel learned of the basis for this motion, they demanded an evidentiary hearing, which the court granted.
 

 Following the hearing, at which Trela, Wallace and Keyho testified, the defendants moved to dismiss the indictments for prosecutorial misconduct. Finding that Ye-novkian did not then know of either investigation, the court concluded that he had answered truthfully when questioned about his knowledge of investigations of the Teamsters and denied the Government’s motion. The court also found that the Government’s unilateral decision to investigate Yenovkian, though improper, was not made with any intention to influence or intimidate him and therefore denied the defendants’ motion to dismiss. Acknowledging that some of the defendants preferred Yenovkian’s removal at this point, and believing that he would inevitably “receive . .. probably a garbled version of what has transpired,” the court proposed to provide him with an objective account of the entire incident and then question him as to what, if any, effect this information had on his impartiality. Defense counsel opposed the court’s proposal and suggested instead that the court inquire generally of the jurors whether they had learned of anything that would bias them against either party. The court adopted this suggestion, put the question to the jury, and accepted the jurors’ negative responses. Yenovkian remained on the jury.
 

 The appellants pursue two lines of argument to support their demand for a new trial. First, they challenge the district court’s ruling that the investigation of Ye-novkian did not prejudice their rights to an impartial jury.
 
 [12]
 
 Alternatively, they argue that regardless of whether any prejudice may have resulted from the incident, the Government’s improper inquiry cast sufficient doubt on the jury’s impartiality and the integrity of the trial to warrant censure
 
 *836
 
 by this court in the exercise of its supervisory power over the conduct of trials in this circuit.
 

 On the question of prejudice, Tashji-an and Campbell rely principally on the Supreme Court’s opinion in
 
 Remmer v. United States,
 
 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954).
 
 [13]
 
 After learning from a juror that he may have been offered a bribe from a third party, the trial court in
 
 Rem-mer
 
 informed the prosecution, but not the defendant, of the reported bribe attempt. At the request of the Government, the FBI immediately investigated the incident, interviewing the juror before the trial ended. No further inquiry was made either during or after the trial. When, following the end of trial, the defendant was finally informed of the third party’s overture to the juror, and the subsequent FBI interview, he moved for a new trial. The trial court refused to hold a hearing, as requested by the defendant, and denied the motion. In reviewing this ruling, the Supreme Court held:
 

 In a criminal case, any private communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious purposes, deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties. The presumption is not conclusive, but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant.
 

 347 U.S. at 229, 74 S.Ct. at 451.
 
 [14]
 
 It was well within the district court’s discretion to find' that the Government had established that the contact did not prejudice appellants. The district court had conducted as extensive an investigation of potential prejudice as appellants would allow and concluded that the jury was not biased. The district court also had reason to discredit objections to the investigation that appellants raised after the jury returned its verdict. The evidence relevant to the counts on which the appellants were properly convicted amply supports those convictions, a factor appropriately considered by the district court in assessing the possibility of prejudice. And the discriminating verdict returned by the jury also tends to belie the appellants’ assertion of prejudice.
 
 [15]
 
 Of the fifteen counts in which Tashjian was named, the jury convicted him on only two and were unable to reach a unanimous verdict on one.
 
 [16]
 
 Of the five counts in which Campbell was named that went to the jury, he was acquitted on one, the conspiracy charge.
 

 The appellants’ failure to show that their rights were substantially prejudiced does not, however, necessarily resolve whether the Government’s investigation of Yenovkian so “needlessly impugned” the integrity of the trial,
 
 United States v. Coast of Maine Lobster Co., Inc.,
 
 538 F.2d 899,903 (1st Cir. 1976), that we should vacate the convictions to deter the Government from repeating its error. By its unauthorized action the Government forced the court and
 
 *837
 
 the defendants to expend valuable time on a problem unrelated to the charges to be tried and, more importantly, introduced an element of unfairness in the early days of the proceedings. It would appear that the Government refused to play by the rules; having exhausted its preemptory challenges, the Government seemed to be trying to taint an undesirable juror in order to obtain his removal. This appearance of impropriety was compounded by the fact that, as the district court found, the Government knew or should have known about the 1978 investigation before the voir dire of Yenov-kian. Although we take a very jaundiced view of the Government’s action, we nevertheless decline to order a new trial as a form of censure in light of the trial court’s findings that the Government acted with good, if poorly informed, intentions. We should not have to remind the Government of its responsibility “to guard jealously the sanctity of the jury’s right to operate as freely as possible from ... unauthorized intrusions purposefully made.”
 
 Remmer v. United States,
 
 350 U.S. 377, 382, 76 S.Ct. 425, 428, 100 L.Ed. 435 (1956).
 

 B. Following the morning recess on the thirteenth day of trial, one of the defense attorneys informed the court that defendant Martin had observed defendant Ricci threaten Ronald Davies, a Government witness who had been testifying that morning. According to Martin, as the jury left for the recess Ricci gestured with his hand and silently mouthed words to the effect that Davies would receive five bullets in his head. After the jury had returned, and while the court consulted with counsel at the sidebar about the incident, defendant DeChane burst out, “All these defendants are in the Mafia, and Ron Davis told everybody.” He then shouted at Davies, “You’re a liar. I ain’t no hit man for the Mafia and these guys.” The court immediately requested the jury to leave the courtroom. Then, as the court and counsel debated the significance of DeChane’s outburst, another disruption occurred and De-Chane screamed, “The FBI is going to kill me. The FBI is going to kill me.”
 

 After excusing the defendants for the day and directing that DeChane receive medical attention, the trial court recalled the jury and carefully instructed them to disregard DeChane’s outbursts, emphasizing his extreme anxiety and irrationality. The court then sought to discover what effect Ricci’s gestures may have had. He asked the jurors whether they had seen anyone gesture towards the witness stand. None of the jurors responded affirmatively, confirming the court’s belief that Ricci was not in the jurors’ line of vision at the time of the reported incident. On the next day of trial the court granted the motions for severance brought by Ricci and DeChane and denied Tashjian’s and Campbell’s motions for mistrial. The court then explained to the jury why Ricci and DeChane were no longer present, again cautioned them to disregard DeChane’s irrational conduct, and inquired whether any of them felt they no longer could impartially decide the case. All indicated they could proceed fairly.
 

 Tashjian and Campbell contend that De-Chane’s outbursts seriously prejudiced them by reinforcing an impression, supposedly created by earlier prosecutorial misconduct, that they were members of the Mafia and used violence to accomplish criminal ends. They find further reason for a new trial in the court’s conclusion that FBI Agent Trela deliberately contributed to the heightened tension which led to the disruption. Among other things, Trela apparently needled several of the defendants during encounters in the hallways of the courthouse, generally bringing to the trial what the court characterized as a “special attitude.”
 
 *
 

 We conclude that the trial court did not abuse its discretion in refusing to order a mistrial or grant the appellants’ post-trial motion for a new trial. When a trial court is confronted with a situation such as this, it must proceed with particular care, sensi
 
 *838
 
 tive to the rights of the “passive” defendants but also to the fact that “[i]f such conduct by a co-defendant on trial were to require a retrial it might never be possible to conclude a trial involving more than one defendant; it would provide an easy device for defendants to provoke mistrials whenever they might choose to do so.”
 
 United States v. Aviles,
 
 274 F.2d 179, 193 (2d Cir.),
 
 cert. denied,
 
 362 U.S. 974, 80 S.Ct. 1057, 4 L.Ed.2d 1009 (1960). A review of other decisions involving multiple defendant trials in which one or more of the defendants created disruptions more serious than that which occurred here, in some cases havoc, convinces us that the district court properly responded to the situation.
 
 See, e. g., United States v. Smith,
 
 578 F.2d 1227 (8th Cir. 1977);
 
 United States v. Marshall,
 
 458 F.2d 446 (2d Cir. 1972);
 
 United States v. Bamberger,
 
 456 F.2d 1119 (3d Cir.),
 
 cert. denied,
 
 406 U.S. 969, 92 S.Ct. 2424, 32 L.Ed.2d 668 (1972). And given the jury’s disavowal of any bias as a result of the disruption, its discriminating verdict,
 
 see
 
 pp. 834-835
 
 supra,
 
 and the ample evidence supporting all but one of appellants’ convictions, the trial court reasonably concluded after the trial that the appellants were not substantially prejudiced by this incident.
 

 C. During the cross-examination of Ronald Davies, defense counsel elicited from him that he had testified previously in another criminal trial involving a bust out bankruptcy fraud scheme. Until then the defendants were unaware of that testimony. Spurred by this discovery, the defendant sought access to the transcript of the testimony and any related statements made by Davies to Government investigators. This demand triggered further inquiry into whether all statements required to be produced under the Jencks Act, 18 U.S.C. § 3500,
 
 [17]
 
 had in fact been produced. As a result, by the following day the Government turned up sixteen reports of interviews not previously divulged. These reports contained notes of interviews with Davies, Allan Klein, Kenneth Weiner and Michael DellOrfano, all of whom, except Davies, had already completed their testimony for the Government. The trial court reviewed these reports and deemed them to be, at least in part, within the Jencks Act mandate.
 

 Arguing that the Government deliberately had failed to produce the reports at the proper time, thus preventing more effective cross-examination of Davies, Klein, Weiner and DellOrfano, the appellants moved for either dismissal of the indictment or a mistrial. The trial court denied the motions, finding that the Government had not acted in bad faith and emphasizing that the newly disclosed reports would have added little, if anything, to the effective cross-examinations already conducted. As found by the court, some of the reports related only in small part to the witnesses’ direct testimony, and the others were essentially cumulative, confirming information available in materials already disclosed by the Government. Nevertheless, the court ordered the Government to have the four witnesses available for further cross-examination if any of the defendants so chose. Some of the defendants did elect to reopen their cross-examination. In response to the appellants’ post-trial motion for a new trial, the district court concluded that the delayed disclosure of these reports did not in any way prejudice the appellants.
 

 
 *839
 
 We find unassailable the district court’s disposition of this problem. Given the unintentional nature of the failure to disclose, the court proceeded properly by analyzing the new evidence to determine whether appellants had been sufficiently prejudiced to receive a new trial. Unlike
 
 United States v. Aaron,
 
 457 F.2d 865 (2d Cir. 1972), relied upon by the appellants, here there were no material differences between those reports that had been earlier disclosed and those belatedly released that could have substantially improved what were already very effective cross-examinations.
 
 See United States v. Missler,
 
 414 F.2d 1293,1304 (4th Cir. 1969),
 
 cert, denied,
 
 397 U.S. 913, 90 S.Ct. 912, 25 L.Ed.2d 93 (1970). In the absence of any evidence of prosecutorial bad faith, nothing distinguishes the present case from prior decisions of this court which fully support the trial court’s ruling.
 
 See United States v. Izzi,
 
 613 F.2d 1205, 1212-13 (1st Cir.),
 
 cert, denied,
 
 446 U.S. 940, 100 S.Ct. 2162, 64 L.Ed.2d 793 (1980);
 
 United States v. Principe,
 
 499 F.2d 1135, 1139 (1st Cir. 1974);
 
 United States v. McGovern,
 
 499 F.2d 1140, 1143 (1st Cir. 1974).
 

 After reviewing the record, we conclude that the district court adequately defused whatever risk of prejudice was presented by the other events identified by Tashjian and Campbell as prejudicial. None of these other incidents,
 
 [18]
 
 viewed singly or cumulatively, significantly endangered the appellants’ right to a fair trial.
 

 Counts Four and Five
 

 Counts Four and Five arose from three sales of electronic calculators by Kenneth Weiner to Tashjian and Campbell. The appellants first approached Weiner early in May of 1974 having heard that he was a likely source for inexpensive stolen goods of high quality. As part of the discussions leading to their agreement to deal, Weiner explained to Tashjian and Campbell in detail how his bust out scheme worked, making clear the fraudulent nature of the endeavor. The following day, Weiner called Campbell to inform him that a shipment of Litronix calculators had arrived at Abing-ton Discount, Weiner’s bust out store. Tashjian and Campbell went to Abington, paid Weiner in cash the previously agreed fifty percent of the invoice price, loaded the calculators into their truck and departed. Later in May Weiner received two more shipments of Litronix calculators of which he immediately informed Tashjian. Tashji-an arrived at Abington the next day with Campbell and DeVincent, paid the agreed price in cash, DeVincent took his cut for “protection,” and the three departed with the calculators. On the basis of these transactions, the appellants were convicted on one count of receiving stolen goods (Count Four) and one count of transferring property in contemplation of bankruptcy (Count Five). We turn first to the appellants’ challenge to their convictions on Count Four.
 

 To prove a violation of 18 U.S.C. § 2315,
 
 [19]
 
 the Government must establish (a) that the goods received had been stolen, (b) that the goods were of a value of at least $5,000, (c) that the goods were “moving as,” were “part of” or “constituted” interstate commerce, and (d) that the defendant knew the goods had been stolen. Relying primarily on
 
 Loman v. United States,
 
 243 F.2d 327
 
 *840
 
 (8th Cir. 1957), appellants argue that for them to have violated § 2315, the calculators had to have been “stolen” before entering interstate commerce. But the earliest the calculators could be deemed to have been stolen, the appellants contend, was when Weiner received the shipments, after the goods had completed their interstate travel. Thus, they conclude, the goods were not “stolen” for purposes of § 2315 and their convictions must fall as legally insufficient.
 

 The appellants’ argument fails in its reliance on
 
 Loman.
 
 At issue in
 
 Loman
 
 was the interplay of two elements of 18 U.S.C. § 2314, which makes unlawful the transportation of stolen goods in interstate commerce. The court held that § 2314 can be violated only if the goods a defendant transports were stolen before transportation occurs. 243 F.2d at 329. But this conclusion hardly undermines the legal basis for the appellants’ convictions. The major distinction between § 2315 and § 2314 is that the former focuses on the
 
 receipt
 
 of such goods, the latter on the interstate
 
 transportation
 
 of such goods. Since the act of transportation is the linchpin of a § 2314 offense, it makes eminent sense to require that the goods transported be stolen at the time they are transported. But because receipt of the goods, not their transportation, is the key event in the offense defined by § 2315, we see no reason to require that the goods must have been stolen before they enter interstate commerce so long as they have been stolen before being received by the defendant and when received are part of interstate commerce.
 
 See United States v. Gardner,
 
 516 F.2d 334 (7th Cir. 1975);
 
 United States v. Jones,
 
 564 F.2d 1315 (9th Cir. 1977). To hold otherwise would be to constrict the scope of § 2315 without justification in the language of the apparent purpose of the statute.
 
 [20]
 

 Whether or not the calculators were stolen before Weiner actually received them,
 
 [21]
 
 there can be no question they had been stolen at the time Weiner sold the goods to Tashjian and Campbell. The more difficult issue is whether the calculators were still part of interstate commerce at the time the appellants obtained them. On this question, we conclude that the evidence, viewed in the light most favorable to the Government, supports the jury’s affirmative finding.
 
 See United States v. Tobin,
 
 576 F.2d 687, 693 (5th Cir.),
 
 cert, denied,
 
 439 U.S. 1051, 99 S.Ct. 731, 58 L.Ed.2d 711 (1978) (jury could conclude that transfer was an integral part of the illegal interstate movement even though stolen goods came to rest in one state).
 
 [22]
 

 To understand the appellants’ challenge to the convictions on Count Five, we must look more closely at Weiner’s mode of operation and the transactions underlying this count. As Weiner explained to Tashjian
 
 *841
 
 and Campbell, throughout his operation of Abington Discount he maintained accurate records of the goods he received in anticipation of the store’s eventual bankruptcy. When shipments arrived at Abington he made photostatic copies of the invoices, carefully removing any references to Ab-ington Discount. These copies were then given to Weiner’s purchasers at the time of sale. Similar care was taken to remove all references to Abington from the boxes in which the goods were shipped. Weiner retained the original invoices as part of his effort to establish a history of apparent legitimacy. Of course, those records documented only the receipt of the goods. In order to justify their absence at the time of the expected bankruptcy, Weiner used several ploys to supplement the records of his relatively insignificant legitimate retail sales. He created records of nonexistent accounts receivable and reported to the police the occurrence of a burglary that he had arranged to be staged. In all, he sought to project an image of lawfulness sufficiently documented to carry him through bankruptcy unscathed.
 

 Three shipments of calculators delivered to Abington Discount comprised the two lots which Weiner sold to Tashjian and Campbell and upon which Counts Four and Five were based. Of these three shipments, all from Litronix Corporation, only one had been ordered by Weiner in the name of Abington Discount. Weiner ordered the other two ostensibly on behalf of the “Gift Box,” a fiction of Weiner’s imagination. Each of these two shipments was sent to Abington because Weiner had told Litronix that the Gift Box was closed for renovation and thus asked that the goods be shipped to Abington for temporary storage.
 

 With this background it is possible to decipher the confusion of Count Five. That count charged:
 

 On or about June of 1974, in the District of Massachusetts, the defendants CHARLES TASHJIAN ...; JAMES CAMPBELL; and Kenneth Weiner, named but not charged herein, as an officer of Abington Discount, Inc., Bankruptcy Count No. 2259-HL, and operator in fact of “Gift Box,” and in contemplation of the filing of bankruptcy proceedings against Abington Discount, Inc. and “Gift Box”, knowingly and fraudulently, with the intent to defeat the bankruptcy law, did transfer and conceal property of the Bankrupt; that is Litronix electronic calculators and accessories.
 

 All in violation of Title 18, United States Code, Sections 152 and 2.
 
 [23]
 

 As interpreted by the district court in its instructions to the jury, and adopted by the Government on appeal, the offense charged in Count Five involved the sale of calculators ostensibly destined for the Gift Box in contemplation of Abington Discount’s bankruptcy. According to the Government, Tashjian and Campbell, as the purchasers, were properly convicted for aiding and abetting Weiner’s transfer of the calculators. The appellants, on the other hand, argue that because the property referred to in the count, as interpreted by the district court, was not the property of the potential bankrupt, Count Five did not allege a violation of 18 U.S.C. § 152. We need not venture into the intricacies of property rights
 
 [24]
 
 because we find a much simpler reason to conclude that the indiscriminate marriage of Abington Discount and Gift Box in one count requires reversal of the convictions.
 

 
 *842
 
 As we, and other courts of appeals, have repeatedly held, a person may be convicted for aiding and abetting another’s commission of a crime only if the Government proves beyond a reasonable doubt that the crime was in fact committed.
 
 [25]
 

 See, e. g., United States v. Gleason,
 
 616 F.2d 2, 20 (2d Cir. 1979),
 
 cert, denied,
 
 444 U.S. 1082,100 S.Ct. 1037, 62 L.Ed.2d 767 (1980);
 
 United States v. Ruffin,
 
 613 F.2d 408, 412 (2d Cir. 1979);
 
 United States v. Indelicato,
 
 611 F.2d 376, 385 (1st Cir. 1979);
 
 United States v. Tarr,
 
 589 F.2d 55, 59 (1st Cir. 1978);
 
 Ray v. United States,
 
 588 F.2d 601, 604 (8th Cir. 1978);
 
 United States v. Staten,
 
 581 F.2d 878, 886-87 (D.C.Cir.1978);
 
 see also Standefer v. United States,
 
 447 U.S. 10, 20-21 n.14, 100 S.Ct. 1999, 2005-2006 n.14, 64 L.Ed.2d 689 (1980). Recently we observed that often the crucial question in reviewing a conviction for aiding and abetting is whether the defendant had the requisite intent to violate the statute at issue.
 
 United States v. Tarr,
 
 589 F.2d at 59. An aider and abettor “ ‘must share in the principal’s essential criminal intent.’ ”
 
 Id.
 
 at 59,
 
 quoting United States v. Sanborn,
 
 563 F.2d 488, 491 (1st Cir. 1977). The corollary to this proposition is that the principal must be shown to have had the “essential criminal intent.” And the Government failed to prove that intent with respect to Count Five.
 

 Contrary to his normal mode of operation at Abington Discount, Weiner did not retain the invoices accompanying the orders sent to Abington on behalf of Gift Box. The reason he did not is that these shipments, in his view, were not related to Abington Discount. Believing that Abing-ton could not be held responsible for the purchase price, Weiner perceived these orders from Litronix, and the subsequent sales to Tashjian and Campbell, as separate from the fraudulent scheme he had devised that was to lead to Abington’s bankruptcy. Given this testimony, which was the sole evidence adduced at trial on Weiner’s intent, the Government failed to prove that Weiner in any way intended to defeat the bankruptcy laws or was contemplating Ab-ington’s bankruptcy in relation to the transfers of Gift Box calculators to Tashjian and Campbell. And if Weiner did not violate 18 U.S.C. § 152 with respect to these particular transfers, then it follows that neither Tash-jian and Campbell aided and abetted the alleged violation of § 152.
 
 [26]
 
 We therefore reverse their convictions on Count Five.
 

 Counts Thirteen and Fourteen
 

 Campbell challenges on two grounds his convictions on one count of mail fraud (Count Thirteen) and one count of use of a fictitious name in furtherance of a mail fraud (Count Fourteen). He contends first that the Government failed to adduce sufficient evidence to sustain his convictions on either count. In the alternative, he argues that the trial court, in the instructions to the jury, defined Count Thirteen as a lesser included offense of Count Fourteen, thus permitting as a matter of law conviction on only one of the two counts. We find neither contention persuasive.
 

 To prove the charge stated in Count Thirteen, a violation of 18 U.S.C. § 1341,
 
 [27]
 
 the
 
 *843
 
 Government had to show that Campbell “was one of the participants in a scheme to defraud and that the mails were used in furtherance of that scheme.”
 
 United States v. Corey,
 
 566 F.2d 429, 430 n.2 (2d Cir. 1977);
 
 see Pereira v. United States,
 
 347 U.S. 1, 8, 74 S.Ct. 358, 362, 98 L.Ed. 435 (1954). To establish a violation of 18 U.S.C. § 1342,
 
 [28]
 
 the basis for Count Fourteen, the Government had to prove that Campbell used a fictitious name in furtherance of a mail fraud scheme. Both counts arose out of Campbell’s activities at Bapi Services Co. during the spring and summer of 1977. Through the testimony of four witnesses, all of whom at the time represented suppliers of Bapi, the Government sought to prove that Campbell ordered merchandise by use of the mails intending not to pay for it and successfully avoided paying for the goods through, among other things, the use of various aliases.
 

 Campbell concedes that the evidence established that, using aliases, he caused to be placed in the mails the orders for merchandise referred to in the two counts. And he acknowledges that the suppliers were never paid for these goods. What he refuses to concede is that the Government produced any evidence that these orders were placed as part of a scheme to defraud. Rather, Campbell insists that the testimony of the four witnesses with respect to his evasion of their efforts to collect payment pertained only to orders which he did not place, for which he was not responsible and which fall outside the scope of the scheme alleged in Counts Thirteen and Fourteen.
 
 [29]
 
 Thus, he concludes, although the Government may have proved he failed to pay for merchandise that he had ordered, it offered no relevant evidence to show he intended to defraud the suppliers.
 

 As Campbell asserts, much of the testimony that would permit an inference of fraudulent intent pertained to orders placed before he joined Bapi. But we cannot agree that this evidence has no relevance to his intent when he placed the orders referred to in Counts Thirteen and Fourteen. What Campbell disregards is that all of his actions testified to by the four witnesses occurred within a six-month period while he was at Bapi. Given this fact, whether or not the evidence of his evasionary tactics directly concerned merchandise orders that he, rather than someone else, had placed, it could fairly be considered by the jury as circumstantial evidence of his intent in all his commercial dealings at Bapi. See Federal Rule of Evidence 404(b); 2 J. Wein-stein & M. Berger, Weinstein’s Evidence ¶ 404[12].
 

 One example of Campbell’s successful deception reveals the most notable link between the evidence of his evasionary tactics and the orders referred to in the two counts. It was established that Campbell usually went under the alias “Mr. Rosen” while he was at Bapi. But when a supplier’s representative, who as yet had not met “Mr. Rosen,” arrived at Bapi to collect an overdue payment from the supposed owner,
 
 *844
 
 “Mr. Rosen,” Campbell identified himself as the shipping person, “Mr. Rowan.” “Rowan” disavowed knowledge of when “Mr. Ro-sen” would return to the store. After waiting for over an. hour, the representative left without payment.
 

 The representative’s testimony about this incident directly evidences Campbell’s deliberate use of aliases to deceive a supplier of Bapi. And this direct evidence of Campbell’s deceptive use of aliases to evade collection efforts permitted the jury to infer that Campbell’s use of an alias when placing the orders referred to in the two counts was similarly deceptive. Use of an alias in itself is “circumstantial evidence of conscious deception.”
 
 United States v. Pearlstein,
 
 576 F.2d 531, 535 (3d Cir. 1978);
 
 United States v. Crim,
 
 527 F.2d 289, 294 (10th Cir. 1975). Such an inference becomes compelling in light of the evidence that Campbell manipulated aliases as a tool of deception. We conclude that there was more than sufficient evidence to sustain the jury’s convictions of Campbell on Counts Thirteen and Fourteen.
 

 The second prong of Campbell’s challenge to his convictions on Counts Thirteen and Fourteen is premised on a misreading of the trial court’s instructions to the jury. According to Campbell, the Double Jeopardy Clause requires dismissal of one of the two counts because of the court’s instructions on the elements of 18 U.S.C. §§ 1341 and 1342 defined § 1341 as a lesser included offense of § 1342.
 
 See Brown v. Ohio,
 
 432 U.S. 161, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977). Although part of the instructions, if read in isolation, could be understood to characterize Count Thirteen as included within Count Fourteen, we conclude that the instructions, read as a whole, adequately defined the elements of the two statutes and the difference between them.
 

 The trial court instructed the jury that to convict on Count Thirteen it must find, among other things, that Campbell had used the mails or caused them to be used. As the court explained, “[t]he gist of the offer*je is the willful misuse of the mails.” In contrast, the instruction on Count Fourteen emphasized that to reach a verdict of guilty, the jury had to find that Campbell had used a fictitious name to further a fraudulent scheme; nowhere in the charge on this count did the court expressly require that the jury find Campbell had used the mails in order to convict. The court’s references to Count Thirteen in the instruction on Count Fourteen reflect the substantial overlap of proof related to the two counts, which arose from the same series of events. Such references were necessary and did not obscure the essential difference between the two counts.
 

 Even if we were to accept Campbell’s reading of the trial court’s instructions, we fail to see how this aids his challenge. Under the Double Jeopardy Clause, if each of the statutes at issue “ ‘requires proof of a fact which the other does not,’ ”
 
 Brown v. Ohio,
 
 432 U.S. at 166, 97 S.Ct. at 2225,
 
 quoting Blockburger v. United States,
 
 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932), as is true of §§ 1341 and 1342, then one is not included within the other and the Clause does not bar convictions on both counts, regardless of how the statutes were defined by the trial court. And if the jury was misled by the court’s charge to believe that the Government had to show that Campbell used the mails in order to prove a violation of § 1342, rather than prejudicing Campbell, this misconception worked to his advantage by increasing the Government’s burden of proof.
 

 In summary, we affirm the convictions on Counts Four, Thirteen and Fourteen and reverse the convictions on Count Five.
 

 [1]
 

 . The district court sentenced Tashjian to concurrent terms of five years imprisonment and sentenced Campbell to concurrent terms of four years.
 

 [2]
 

 . Of the fifteen defendants’named in the indictment, only five others went to trial with Tashji-an and Campbell — Richard DeVincent, Ronald DeChane, Frederick Benjamin, Joseph Ricci and Larry Martin. Three of the defendants— Charles Andronica, Mitchell Weissman and Richard Ross — were tried separately. Three defendants — Allan Klein, Ronald Davies and Walter Downing — pled guilty to Count One and testified as witnesses for the Government. Defendant Gerald Dyer pled guilty to Count One and one count charging a violation of 18 U.S.C. § 152. The fifteenth defendant, Fallon Gately, died prior to trial.
 

 [3]
 

 . Because Counts Twenty-Three and Twenty-Four, both of which charged Campbell with filing a false tax return in violation of 26 U.S.C. § 7206(1), were severed from the case prior to trial, we assume for the remainder of this opinion that the indictment contains only twenty-two counts.
 

 [4]
 

 . 18 U.S.C. § 1962 provides in pertinent part:
 

 (c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise’s affairs through a pattern of racketeering activity or collection of unlawful debt.
 

 (d) It shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section.
 

 [5]
 

 . Weiner, an unindicted coconspirator, received immunity from prosecution in exchange for his testimony.
 

 [6]
 

 . A bust out begins with the formation by the malefactors of a seemingly legitimate wholesale business. The fledgling business’s first goal is to establish a favorable credit rating. This task is accomplished by a number of devices which can include temporarily putting cash into the business in order to create a strong balance sheet, bribing credit rating agencies, and inflating financial statements so as to vastly overstate the business’s assets and net worth. Also, bills for the company’s initial purchases are promptly paid — thus furthering the deception through enhancement of the company’s credit standing. As the business becomes more established, its promoters order considerable amounts of additional merchandise although they have no intention of paying for these goods. A huge inventory, most of it not paid for, is built up. The principals then busy themselves disposing of their purchases at substantial discounts or secreting the unsold portion for later below-cost covert sales. In other words, they “bust out” the business. The company is then petitioned into bankruptcy with the mulcted creditors left to pick over the meatless carcass of an assetless enterprise. The con men, or at least those whose names are legally associated with the bankrupt company, suffer a loss of their credit standing and “good” name. In return, they and their cocon-spirators reap handsome monetary benefits for having arranged in advance the demise of a local wholesale outfit.
 
 United States v. Crockett,
 
 534 F.2d 589, 592 (5th Cir. 1976).
 

 [7]
 

 . At various points throughout the trial there was some dispute over the proper characterization of the price paid by the buyers of bust out goods. We think it most accurate to identify this price as a percentage of the cost, as stated on the supplier’s invoice, at which the bust out operator “purchased” the goods. Thus, we use the phrase “invoice price.”
 

 [8]
 

 . 18 U.S.C. § 1961(4) provides:
 

 “enterprise” includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity[.]
 

 [9]
 

 . Federal Rule of Criminal Procedure 8(b) provides:
 

 Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.
 

 [10]
 

 . Federal Rule of Criminal Procedure 14 provides in pertinent part:
 

 If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder or trial together, the court may order an election of separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires.
 

 [11]
 

 . We find nothing in the decisions relied upon by the appellants to persuade us otherwise. The indictments at issue in
 
 United States v. Marionneaux,
 
 514 F.2d 1244 (5th Cir. 1975), and
 
 United States v. Levine,
 
 546 F.2d 658 (1977), contained defects not present in Count One of the indictment in this case. We cannot discern from the discussion in
 
 United States v. Lucido,
 
 486 F.2d 868 (6th Cir. 1973), whether the court ruled that the district court had abused its discretion in denying a motion for severance under Fed.R.Crim.P. 14 or simply disregarded the Supreme Court’s reasoning in
 
 Schaffer v. United States,
 
 362 U.S. 511, 80 S.Ct. 945, 4 L.Ed.2d 921 (1960). If the former, we note only that it is factually distinguishable from this case. But if the court’s decision was premised on an implicit rejection of
 
 Schaffer,
 
 we decline to follow its lead.
 

 [12]
 

 . Neither of the appellants questions the adequacy of the district court’s inquiry into the inciuent. See, e.
 
 g.. United States v. Almonte,
 
 594 F.2d 261, 266 (1st Cir. 1979). We note that, although the appellants did renew their objections to the Yenovkian investigation after the jury had returned its verdict, they did not demand a new evidentiary hearing.
 

 [13]
 

 . Without entering into a full analysis of all the differences between this case and
 
 Sinclair v. United States,
 
 279 U.S. 749, 49 S.Ct. 471, 73 L.Ed. 938 (1929), we simply note that the two cases are substantially different on their facts.
 

 [14]
 

 . On remand, the district court conducted a hearing and concluded that the FBI’s communication with the juror did not prejudice the defendant. The Supreme Court reversed and ordered a new trial in light of the evidence disclosed at the hearing.
 
 Remmer v. United States,
 
 350 U.S. 377, 76 S.Ct. 425, 100 L.Ed. 435 (195d).
 

 [15]
 

 . Our ruling that the convictions on Count Five must be reversed does not vitiate this factor in light of the extremely confusing structure of that count and the district court’s failure to adequately instruct on the findings necessary to convict a defendant for aiding and abetting.
 
 See
 
 n.25 infra.
 

 [16]
 

 . The jury was hung on Count Three, which charged Tashjian and DeVincent with a violation of the Hobbs Act, 18 U.S.C. § 1951. In
 
 United States v. DeVincent,
 
 632 F.2d 155 (1st Cir. 1980), we held that the Double Jeopardy Clause did not bar a retrial of Tashjian and DeVincent on this count.
 

 *
 

 After DeChane’s outbursts occurred, the district court reprimanded Trela and ordered that there was to be “no more banter, no more communications between government representatives and defendants or witnesses.”
 

 [17]
 

 . 18 U.S.C. § 3500 provides in pertinent part:
 

 (b) After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified. If the entire contents of any such statement relate to the subject matter of the testimony of the witness, the court shall order it to be delivered directly to the defendant for his examination and use.
 

 * * * # * *
 

 (d) If the United States elects not to comply with an order of the court under paragraph (b) or (c) hereof to deliver to the defendant any such statement, or such portion thereof as the court may direct, the court shall strike from the record the testimony of the witness, and the trial shall proceed unless the court in its discretion shall determine that the interests of justice require that a mistrial be declared.
 

 [18]
 

 . Disregarding an order of the district court, Agent Trela included in his testimony recounting a conversation he had with Campbell a brief reference by Campbell to Tashjian. Assuming this reference presented a
 
 Bruton
 
 problem, which we seriously doubt, we conclude that it was beyond all reasonable doubt harmless to Tashjian.
 
 See Parker v. Randolph,
 
 442 U.S. 62, 70-71, 99 S.Ct. 2132, 2137-2138, 60 L.Ed.2d 713 (1979);
 
 Schneble v. Florida,
 
 405 U.S. 427, 430, 92 S.Ct. 1056, 1058, 31 L.Ed.2d 340 (1972).
 

 [19]
 

 . 18 U.S.C. § 2315 provides:
 

 Whoever receives, conceals, stores, barters, sells, or disposes of any goods, wares, or merchandise, securities, or money of the value of $5,000 or more, or pledges or accepts as security for a loan any goods, wares or merchandise, or securities, of the value of $500 or more, moving as, or which are a part of, or which constitute interstate or foreign commerce, knowing the same to have been stolen, unlawfully converted, or taken, ... [sjhall be fined not more than $10,000 or imprisoned not more than ten years, or both.
 

 [20]
 

 .In their rather half-hearted reliance on an unidentified ambiguity in § 2315 to justify invocation of the rule of lenity, the appellants disregard Justice Frankfurter’s admonition in
 
 Callahan v. United States:
 

 Petitioner invokes the “rule of lenity” for decision in this case. But that “rule,” as is true of any guide to statutory construction, only serves as an aid for resolving an ambiguity; it is not to be used to beget one. “To rest upon a formula is a slumber that, prolonged, means death.” Mr. Justice Holmes in Collected Legal Papers, p. 306. The rule comes into operation at the end of the process of construing what Congress has expressed, not at the beginning as an overriding consideration of being lenient to wrongdoers. That is not the function of the judiciary.
 

 364 U.S. 587, 596, 81 S.Ct. 321, 326, 5 L.Ed.2d 312 (1961) (footnote omitted).
 

 [21]
 

 . In light of our holding, we do not reach the Government’s contention that the goods were “stolen” as of the time they left the possession of Weiner’s supplier.
 
 Cf. United States v. Ferrara,
 
 571 F.2d 428, 429-30 (8th Cir.),
 
 cert. denied,
 
 437 U.S. 907, 98 S.Ct. 3097, 57 L.Ed.2d 1138 (1978) (goods ordered with no intention to pay were stolen “once the goods were loaded on interstate carriers bound for defendants’ place of business”).
 

 [22]
 

 . Given the district court’s statement that one of the factors it considered in determining the appropriate sentence for each of Campbell’s four convictions was the total number of convictions, we decline to invoke the concurrent sentence doctrine to dispose of Campbell’s challenge to his other convictions.
 
 See Benton v. Maryland,
 
 395 U.S. 784, 788-91, 89 S.Ct. 2056, 2059-60, 23 L.Ed.2d 707 (1969).
 

 [23]
 

 . 18 U.S.C. § 152 provides in pertinent part:
 

 Whoever, either individually or as an agent or officer of any person or corporation, in contemplation of a case under title 11 by or against him or any other person or corporation, or with intent to defeat the provisions of title 11, knowingly and fraudulently transfers or conceals any of his property or such other person or corporation ... [sjhall be fined not more than $5,000 or imprisoned not more than five years, or both.
 

 18 U.S.C. § 2 provides:
 

 (a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.
 

 (b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.
 

 [24]
 

 . Nor need we reach the other grounds for reversal advanced by Campbell.
 

 [25]
 

 . Not only did the district court fail to so instruct the jury, but the appellants never objected to the court’s omission. Because we reverse these convictions for insufficient evidence, and not for inadequate instructions, we do not decide whether the court plainly erred.
 

 [26]
 

 . Although a defendant may be convicted as an aider and abettor through proof that he “cause[dj” an
 
 innocent
 
 person to commit a criminal offense, 18 U.S.C. § 2(b);
 
 see United States v. Gleason,
 
 616 F.2d 2, 20 (2d Cir. 1979);
 
 United States v. Rucker,
 
 586 F.2d 899, 905 (2d Cir. 1978), the Government has not argued, and properly so in our opinion, that this theory applies to Weiner’s transfer of the calculators to Tashjian and Campbell.
 

 [27]
 

 .18 U.S.C. § 1341 provides:
 

 Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the
 
 *843
 
 purpose of executing such scheme or artifice or attempting so to do in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Post Office Department, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the directions thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.
 

 [28]
 

 . 18 U.S.C. § 1342 provides:
 

 Whoever, for the purpose of conducting, promoting, or carrying on by means of the Post Office Department of the United States, any scheme or device mentioned in section 1341 of this title or any other unlawful business, uses or assumes, or requests to be addressed by, any fictitious, false, or assumed title, name, or address or name other than his own proper name, or takes or receives from any post office or authorized depository of mail matter, any letter, postal card, package, or other mail matter addressed to such fictitious, false, or assumed title, name, or address, or name other than his own proper name, shall be fined not more than $1,000 or imprisoned not more than five years, or both.
 

 [29]
 

 . As defined in Counts Thirteen and Fourteen, the scheme to defraud included only those orders for merchandise actually placed by Campbell.